THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| GUARANTEE INSURANCE COMPANY, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action |
| | : | No. 5:07-cv-307 (CAR) |
| MERCHANTS EMPLOYER BENEFITS, INC., *et al.* | : | |
| Defendants. | : | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Defendants, Merchants Employer Benefits, Inc. ("Merchants") and Jimmy J. Selph, have moved for partial summary judgment against Plaintiff Guarantee Insurance Company ("Guarantee"). Defendants' Motion (Doc. 49) is hereby **GRANTED, IN PART**, and **DENIED, IN PART**. Because there are genuine issues of material fact as to Guarantee's claims related to breach of contract, *quantum meruit*, and piercing the corporate veil, summary judgment is denied as to Counts One, Two, and Six. Guarantee has failed, however, to establish genuine issues of material fact as to its tort claims and claims for specific performance and accounting. Accordingly, summary judgment is granted as Counts Three, Four, Five, Seven, and Eight.

**STANDARD ON MOTION FOR SUMMARY JUDGMENT**

Motions for summary judgment in federal courts are governed by the Federal Rules of Civil Procedure. Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th

Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

**ANALYSIS OF CLAIMS**

**I.     Count One: Breach of Contract**

The primary claim in this case is the breach of contract claim in Count One, which arises from a series of transactions between Merchants and Guarantee. Merchants is a "Professional Employer Organization," or "PEO," that provides staffing and human resources services to other businesses. Guarantee is an insurance company that issues workers' compensation policies to employers such as Merchants. In 2004, Merchants and Guarantee entered into a complex arrangement for the provision of workers' compensation insurance for the employees that Merchants "leased" to its clients. The arrangement also involved the establishment of a "segregated portfolio" with a reinsurance company, Caledonian Reinsurance SPC ("Caledonian").

Resolution of the claim is complicated by the lack of any written contract between Guarantee and Merchants to define the very complex insurance program that Guarantee proposed. The evidence submitted by Guarantee shows that there was a series of communications between agents for Guarantee and Merchants in October 2004, followed shortly afterwards by the beginning of performance by both parties. As part of this performance, Guarantee entered into written contracts of insurance directly with Merchants' clients. Merchants in turn had written contracts with its clients that obligated it to provide workers' compensation insurance. Merchants also entered into a written agreement with Caledonian regarding the creation of the segregated portfolio, as contemplated in Merchants' negotiations with Guarantee.

Although there is no comprehensive written document defining the program, there is sufficient evidence for a reasonable jury to find that Guarantee and Merchants entered into a contractual relationship. "Georgia law recognizes that oral contracts falling outside the purview of the Statute of Frauds may be binding and enforceable." Turner Broadcasting System, Inc. v.

McDavid, 303 Ga. App. 593, 596 (2010). See, also, O.C.G.A. §§ 13-1-5, 13-1-6. The subject matter of the agreement in this case does not fall within the purview of the Statute of Frauds. See O.C.G.A. § 13-5-30. In seeking to enforce an oral contract, Guarantee as plaintiff bears the burden of proving three elements: "subject matter of the contract, consideration, and mutual assent by all parties to all contract terms." Cline v. Lee, 260 Ga. App. 164, 168 (2003).

The issue in this case is whether the parties consented to all contract terms by mutual assent, that is, whether there was a meeting of the minds between the parties. There is no question about the subject matter of the contract, which was the creation of a workers' compensation program for employees that Merchants leased to its clients. There is also no question about the existence of consideration, where Guarantee was to provide certain insurance coverage and Merchants was to pay certain premiums. As to the terms of the contract, however, Merchants contends that it had no agreement about its responsibility for paying premiums to Guarantee on behalf of Merchants' clients.

There are genuine issues of material fact concerning Merchants' obligation to pay premiums. The evidence submitted by Guarantee, construed in the light most favorable to Guarantee, supports a finding that the two parties entered into an agreement to establish a workers' compensation insurance program for Merchants. Based on the evidence submitted by Guarantee, a reasonable jury could find that the terms of this agreement included an obligation by Merchants to pay premiums to Guarantee for the employees it leased to its clients, regardless of whether Merchants had collected those premiums from its clients first. As such, there are genuine issues of material fact that preclude summary judgment on Guarantee's breach of contract claim.

The evidence of the agreement between Guarantee and Merchants is outlined in the affidavit of Paul Halter and the supporting documents. Halter's Affidavit is in the record as Exhibit D to

Plaintiff's Response (Doc. 59). In 2004, Halter was the president and chief operating officer of Guarantee. In his affidavit, Halter explains the process that led to the formation of the workers' compensation program for Merchants. The agreement was formed through a series of written and oral negotiations between Halter and Merchants in October 2004. Performance of the agreement was initiated shortly afterward, and was reflected in a series of documents executed between Guarantee and the clients of Merchants, between Merchants and its clients, and between Merchants and the reinsurer, Caledonian. These documents provide further detail as to the nature of the agreement reached.

The first step in the formation of the program took place on October 14, 2004, when Halter wrote a proposal to Don Smith, an agent of Merchants. Halter's proposal outlined in some detail Guarantee's program for providing workers compensation coverage to PEOs such as Merchants, including the following "finer points of the program":

- A. **Estimated Annual Premium**: The actual premium quote on class codes we are able to ensure is $97,436. Our minimum premium for the program is $100,000 thus all calculations are based on that minimum. We are hopeful that the actual premium is much larger and that with a stable WC program MEB will be able to grow.
- B. **Deductible**: This is a no deductible plan. Guarantee Insurance Company (GIC) pays from the first dollar of expense. In the material sent to me by this account concerning becoming a self-insurer, MEB would have up to a $400,000 self-insured retention per claim.
- C. **Minimum Deposit Premium**: GIC requires a minimum of 25% of the estimated annualized premium as a working down payment. After that deposit, MEB may pay us on a weekly, bi-monthly or monthly reporting schedule.
- D. **Minimum Monthly Payment**: This is simply the balance of premiums due

5

based on the Estimated Annual Premium minus the Minimum Deposit Premium paid over 11 months. Naturally, when MEB grows this amount will go up as they report payrolls each reporting period.

E. **Segregated Portfolio Captive Surplus Contribution**: GIC is allowed to write this class of business because it has reinsurance treaties and Department of Insurance approvals based on being able to cede (transfer) some of the premiums and losses back to the insured. The minimum funds we must have between premiums and surplus is $250,000. This account develops only $100,000 leaving a difference of $150,000. The standard deal is that we require 50% of annualized premiums as surplus, as long as the minimum amount of $250,000 is in the program. What this creates for MEB are two options for growth. They are as follows.

> **Option One**: One hundred percent of the additional $150,000 that is placed in the segregated portfolio captive is committed to a surplus note paying T bill rates for a minimum of 5 years. This creates premium capacity of $600,000 for MEB.
>
> **Option Two**: Fifty percent of the additional $150,000 that is placed in the captive is committed to a surplus note paying T bill rates for 5 years and the balance in a funds withheld account with the captive insurer. This option creates premium capacity of $300,000.

F. **Minimum Surplus Contribution Upon Binding**: This is fifty percent of the Surplus Contribution discussed above which equals $75,000, regardless of which option is chosen.

G. **Balance of Surplus Contribution**: The additional $75,000 is due within 30 dates of the effective date regardless of the option chosen.

H. **TIMCo Program Management Fee**: This is a flat annual charge without regard to premium size. It includes all expenses associated with managing the program for MEB and is due and fully earned when coverage is bound.

I. **Minimum Deposit to Bind**: This is the totals of the minimum payment for: annualized premiums + one half of surplus contribution + TIMCo's fee.

> J.  **Annualized Estimated Expense**: Assuming no growth in payroll processed is the total annualized estimated premiums + surplus contribution + TIMCo's management fees.

Pl.'s Resp. Ex. A. There is no evidence in the record before the Court that Smith or any other representative of Merchants responded to Halter's proposal in writing. This proposal established the background for subsequent communications between the parties and formed the foundation of the arrangement that the parties entered into.

Some time shortly after sending the proposal to Smith, Halter traveled to the offices of Merchants in Warner Robins, Georgia, to meet personally with Smith and Defendant Jimmy Selph, the owner and president of Merchants. At this meeting, Halter "explained the mechanisms regarding writing PEOs, the underwriting requirements, and the quota share reinsurance arrangement between Guarantee, Caledonian, and the PEO." Halter Aff. ¶ 3. Halter used a white board to demonstrate "all of the math behind the program and the quota share reinsurance arrangement." Id. According to Halter, both Smith and Selph indicated that they understood the proposal. There is no indication that either of them made a counterproposal or objected to any of the terms outlined by Halter.

After the meeting in Warner Robins, Halter sent a letter to Smith and Selph dated October 29, 2004. Pl.'s Ex. E. The letter was headed "Program Implementation," and confirmed that Guarantee had "received the funds required to place the program in effect." Id. This letter clearly implies that Halter understood the parties to have an agreement. Most of the letter outlines the "rules of engagement" for writing business, focusing on the underwriting requirements for issuing policies to each of Merchants' clients. Paragraph 6 of the letter, however, deals with billing for premiums. In paragraph 6, Halter informs Smith and Selph that Guarantee's accounting department "will begin invoicing you for policies written on a monthly basis beginning in December 2004."

7

Id. There is no evidence in the record that Selph or Smith ever responded to Halter's October 29 letter or disputed its terms. Merchants' failure to respond to or dispute Halter's letter could be interpreted by the finder of fact as an assent to the representations in the letter. See O.C.G.A. § 24-4-23; Forrest Cambridge Apartments, LLC v. Redi-Floors, Inc., 295 Ga. App. 840 (2009).

A reasonable jury could find, based on the correspondence between Halter and Merchants outlined above, that an agreement existed by October 29, 2004, at the latest. The dispute then turns on the construction of that agreement, particularly of its terms regarding payment of premiums.

Merchants primarily disputes that it had any obligation to pay premiums for workers' compensation policies issued to its "non-payroll" clients. Merchants differentiates its "payroll" clients from its "non-payroll" clients, and contends that it was responsible only to forward premiums that it collected from its payroll clients. "Payroll" clients were clients for whom Merchants supervised payroll activities. For these clients, Merchants would withhold workers compensation premiums from the payroll funds each pay period. Selph Dep. 46. According to Merchants, the non-payroll clients were required to make their own premium payments directly to Guarantee. See Selph Dep. 48, 181. Merchants acknowledges that it was obligated to forward premiums collected from payroll clients to Guarantee, and seems to concede that it failed to forward some of those premiums as required. Merchants disputes, however, that it had any obligation to pay premiums to Guarantee for clients who did not pay their premiums to Merchants.

The parties have submitted conflicting evidence regarding their agreement as to payment of premiums. Selph has testified that he understood the Guarantee program to be a "pay-as-you-go program," meaning that premiums were to be "deducted from payroll expenses and then remitted." Selph Dep. 88 (Def.'s Ex. 11 (Doc. 50)). Under such a program, "[i]f there's no payroll, there's no premium." Id. Halter disputes Selph's characterization, and has denied that the program was a pay-

8

as-you-go program. Halter's deposition includes the following exchange:

> Q. You had a program that was specifically designed for PEOs, did you not?
>
> A. Yes.
>
> Q. And you called it a pay-as-you-go program?
>
> A. No. Pay-as-you-go is just a billing option that fit very nicely with PEOs.

Halter Dep. 18 (Pl's Ex. C). Halter's testimony indicates that Guarantee expected Merchants to be responsible for paying premiums for its clients. His understanding of the agreement is supported by the terms outlined in his letter of October 14, 2004, which stated that Merchants would be required to pay up front a minimum of 25% of the estimated annual premium and to continue paying premiums on a weekly, bi-monthly, or monthly schedule. Pl.'s Ex. A. A reasonable jury could draw the inference, from Halter's testimony and the terms of the October 14 proposal, that the parties intended for Merchants to take the primary responsibility for paying premiums to Guarantee.

Additional support for Guarantee's construction of the agreement is provided by the documents subsequently executed by the parties in performance of the agreement. These documents create the framework of the workers' compensation program that Merchants and Guarantee initiated by their agreement. They are relevant both as evidence that Merchants entered into an agreement with Guarantee based on the October negotiations with Paul Halter and as evidence of the terms of that agreement. A contract that is uncertain, vague, or indefinite may become binding and enforceable if one party enters into performance of the agreement and the other party accepts that performance. See Pine Valley Apartments Ltd. Partnership v. First State Bank, 143 Ga. App. 242, 244-45 (1977). Moreover, "[a] contract which is originally and inherently too indefinite may later acquire precision and become enforceable by virtue of the subsequent acts, words, or conduct of the parties." Id. at 245.

Halter's October 29, 2004 letter indicates that Merchants began its performance under the agreement by wiring the separate collateral funds and initial premium payments required to place the program into effect. Halter Aff. ¶ 4. After receiving these payments, Guarantee issued insurance policies to the clients of Merchants. These policies listed Merchants as "alternate employer," and stated that the coverage would apply "as though the alternate employer is insured." Pl.'s Resp. Ex. F. On October 25, 2004, Merchants executed the required reinsurance agreement with Caledonian and formed Segregated Portfolio 104 as contemplated in Halter's original proposal. Pl.'s Resp. Exs. CC, DD.

Merchants, meanwhile, had separate agreements with its clients. The record submitted by Guarantee shows that Merchants had separate agreements with its payroll and non-payroll clients. In its leasing agreement with non-payroll clients, Merchants provided:

> [Merchants] shall provide workers compensation coverage for Covered Employees and shall be considered the statutory employer of Covered Employees for workers' compensation purposes. [Merchants] warrants that it will comply with all applicable workers' compensation laws. . . . [Client/Employer] shall be responsible for providing workers' compensation coverage to those employees not subject to and/or covered by this Agreement.

Pl.'s Resp. Ex. G. In this agreement, Merchants represents to its clients that it would take the responsibility for providing workers' compensation insurance for its leased employees, and that the client would only be responsible for providing coverage for its own employees, those that were not leased from Merchants. A finder of fact could draw the reasonable inference that this agreement reflects an intent on the part of Merchants to pay the premiums for employees leased to non-payroll clients. Merchants had a similar agreement with its payroll clients, in which it represented that Merchants would "provide and/or administer Workers Compensation Insurance." Pl.'s Resp. Ex.

10

I. Nothing in either agreement indicates that the client employers had any obligation to pay Guarantee or any other insurer directly for workers' compensation costs.

The evidence set forth above creates genuine issues of material fact as to the existence and terms of the agreement between Guarantee and Merchants. To summarize, there are four key pieces of evidence that support Guarantee's claim for breach of contract:

> **First**, the original proposal from Paul Halter on October 14, 2004, provides that Merchants must make a down payment of 25% of the estimated annual premium and requires Merchants to continue making premium payments "on a weekly, bi-monthly or monthly schedule." Pl.'s Resp. Ex. A. Nothing in this proposal can be read to indicate that anyone other than Merchants was responsible for premiums. Merchants made no counter-proposal or objection to any of the proposal's terms.
>
> **Second**, in the follow-up "rules of engagement" letter of October 29, 2004, Halter reiterated that Merchants would be invoiced for premiums on a monthly basis. Pl.'s Resp. Ex. E. Again, there is no evidence of any response or objection to these terms from Merchants and nothing to indicate that anyone other than Merchants was responsible for paying premiums.
>
> **Third**, in his deposition testimony, Halter states that the program was not a "pay-as-you-go" program and indicates that Merchants was responsible for paying premiums.
>
> **Fourth**, in the documents that Merchants executed with its clients, Merchants indicates that it, not the clients, had the responsibility to provide and administer workers' compensation insurance. From these documents, it can be inferred that Merchants understood it had an obligation to pay premiums for its leased employees.

A reasonable jury could find, based on this evidence, that there was an agreement between

Guarantee and Merchants, and that this agreement required Merchants to pay premiums for all workers' compensation policies under the program. As such, summary judgment is not warranted as to Guarantee's breach of contract claim.

## II. Count Two: Quantum Meruit

In Count Two of the Complaint, Guarantee states a claim in *quantum meruit*, as an alternative to its breach of contract claim. Guarantee alleges that Merchants obtained valuable services from Guarantee in the form of insurance coverage and that it is obligated to compensate Guarantee for those services. Merchants has failed to show that it is entitled to summary judgment as to Count Two.

*Quantum meruit* is "an equitable doctrine based on the concept that no one who benefits from the labor and materials of another should be unjustly enriched thereby." Nextel South Corp. v. R.A. Clark Consulting, Ltd., 266 Ga.App. 85, 97 (2004). Even in the absence of an enforceable contract, this doctrine allows the provider of such services to recover the value of such services, although that value is defined with reference to the recipient's gain rather than the provider's costs. Id. To recover in *quantum meruit*, Guarantee must show: (1) that it performed services valuable to Merchants; (2) that Merchants either requested or knowingly accepted those services; (3) that receipt of the services without compensation would be unjust; and (4) that Guarantee expected compensation at the time it performed the services. Id. at 86.

Guarantee has shown that there is sufficient evidence to support each element of its *quantum meruit* claim. The documents show that Guarantee performed services for Merchants by issuing workers' compensation policies to cover employees leased to Merchants' clients. These policies were valuable to Merchants in that they were critical to the value of the services Merchants provided to its own clients. The history of the negotiations between the parties leading up to the initiation of

12

the workers' compensation program shows that Merchants knowingly accepted those services. Receipt of those services without payment would allow Merchants to be enriched at Guarantee's expense. Finally, Halter's initial proposal make clear the obvious point that Guarantee expected to be paid for its policies. Accordingly, a reasonable jury could find that Merchants is obligated to compensate Guarantee in *quantum meruit*, to the extent that the premiums Merchants paid were less than the value of the services to Merchants.

### III.     Count Three - Negligence

In Count Three, Guarantee alleges that Merchants and Selph were "negligent in the collection and transmission of the Premiums." Amended Complaint ¶ 83. Because Guarantee has failed to produce evidence showing that Merchants or Selph had a duty to Guarantee independent of their contractual obligations, Count Three is subject to summary judgment.

Although plaintiffs often attempt to plead "negligence" claims in the context of contract actions, such claims are difficult to establish. Courts in Georgia have consistently held that a negligence action arises only when there are duties between the contracting parties independent of the duties imposed by the contract:

> It is well settled that mere failure to perform a contract does not constitute a tort. A plaintiff in a breach of contract case has a tort claim only where, in addition to breaching the contract, the defendant also breaches an independent duty imposed by law. This is true even in situations where the contract is breached in bad faith, where the courts have consistently held that punitive damages are not available because there has been no tort.

Service Master Co., L.P. v. Martin, 252 Ga. App. 751, 754 (2001). In determining whether a cause for negligence arises in the context of a contractual relationship, courts must make a "distinction between nonfeasance or the mere failure to perform the contract at all, and misfeasance or the

13

negligent performance of the contract." Mauldin v. Sheffer, 113 Ga. App. 874, 879 (1966). Misfeasance or negligent performance is such that it results in "an independent injury over and above the mere disappointment of plaintiff's hope to receive the contracted-for benefits." Construction Lender, Inc. v. Sutter, 228 Ga. App. 405, 409 (1997).

"Negligent performance of the contract" does not mean simply that the breach of contract was the result of negligence on the part of the contracting party. It means that one party to a contract committed some act of negligence in the performance of the contract that injured the other party in a manner independent of the breach. For example, a professional such as a doctor or architect or engineer performing a contract has an independent obligation "to exercise a reasonable degree of care, skill and ability, such as is ordinarily exercised under similar conditions and like circumstances by persons employed in the same or similar profession." Mauldin at 880. The injury that results from a failure to employ that skill is different from the injury for mere breach of the contract.

This case is a case of mere breach, simple nonfeasance. The allegation is that Merchants and Selph failed to pay the premiums as required by their contract with Guarantee. Guarantee seeks to recover the unpaid premiums. There is no evidence that Merchants or Selph somehow paid the premiums in a manner that caused injury to Guarantee independent of the loss of the premiums. Indeed, it is difficult to imagine such a situation. This case is a breach of contract case, not a tort case. Accordingly, as to Count Three, summary judgment is granted.

## IV.     Count Four – Theft/Conversion

Count Four of the Complaint, in which Guarantee alleges that Merchants and Selph wrongfully retained possession of premiums paid by clients of Merchants, is another attempt to create a tort action out of a breach of contract. Guarantee has failed to present evidence sufficient to establish a claim for conversion.

The tort of conversion is defined as "an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." Maryland Cas. Ins. Co. v. Welchel, 257 Ga. 259, 261 (1987). The personal property of another may include identifiable cash; a document such as a check, promissory note, or negotiable instrument; or specific amounts of money placed on deposit with a bank. Decatur Auto Center v. Wachovia Bank, N.A., 276 Ga. 817, 820-21 (2003).

In this case, Guarantee has failed to present evidence that Merchants or Selph exercised dominion over its personal property. Guarantee has introduced evidence that Selph took money that Merchants clients had submitted as premiums and used it to start a new corporation with his wife. Guarantee has not shown that this money was its personal property. The fact that Merchants may have been contractually obligated to pay this money to Guarantee did not make this money the property of Guarantee. The funds had never been in the possession or control of Guarantee, whether in the form of cash, a check, or a bank account. Merchants' failure to pay those funds to Guarantee as agreed would be a breach of contract, not a conversion.

**V.    Specific Performance**

In Count Five of the Complaint, Guarantee seeks specific performance of Merchants' contractual obligation to Caledonian to deposit an amount of collateral with Guarantee. "Specific performance is an extraordinary, equitable remedy, which will be granted only if the complainant does not have an adequate remedy at law." Kirkley v. Jones, 250 Ga. App . 113, 115-16 (2001). Guarantee has failed to present evidence that there is no adequate remedy at law. In its Response, Guarantee contends that it is "currently exposed to excessive liability for any and all pending catastrophic claims since the collateral fund is under capitalized by [Merchants'] failure to pay the

15

appropriate premiums that would allow [Guarantee] to contribute to the fund." Pl.'s Resp. p. 14. Guarantee has failed to present any evidence, however, to show that it remains exposed to catastrophic claims. Thus, Guarantee has failed to present any factual basis for a finding that there is no adequate remedy at law to compensate for the alleged failure to pay collateral, and summary judgment must be granted as to Count Five.

## VI. Count Six – Disregarding the Corporate Entity

In Count Six, Guarantee seeks to disregard the corporate entity of Merchants so that it can have access to Selph's personal assets or to the assets of other corporations owned by Selph. The evidence submitted by Guarantee is sufficient to create genuine issues of material fact concerning Selph's operation of Merchants and to permit a reasonable jury to find that Selph used Merchants as an alter ego without due regard for its separate corporate identity.

To establish that a corporation or other business entity is the alter ego or business conduit of its owner, there must be evidence that the owner or owners of the business have abused the corporate form for illegitimate purposes. A plaintiff seeking to pierce the corporate veil must show three things: "[1] that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; [2] that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and [3] [that] to adhere to the doctrine of corporate entity would promote injustice or protect fraud." Derbyshire v. United Builders Supplies, Inc., 194 Ga.App. 840, 844 (1990) (quoting Trans-American Communications v. Nolle, 134 Ga. App. 457, 460 (1975)).[1] Evidence to show disregard

---

[1] The Georgia Supreme Court has held that Georgia law does not recognize "reverse veil-piercing," that is, piercing of the veil "to the extent that it would allow an 'outsider,' such as a third-party creditor, to pierce the veil in order to reach a corporation's assets to satisfy claims against an individual corporate insider." Acree v. McMahan, 276 Ga. 880, 881 (2003). In such cases, a plaintiff must pursue legal remedies, possibly by means of a fraudulent conveyance claim. Id.

16

of a corporate entity may include the "commingling [of funds] on an interchangeable or joint basis or confusing the otherwise separate properties, records[,] or control." Anthony v. Gator Cochran Constr., Inc., 299 Ga. App. 126, 142 (2009).

Piercing the corporate veil requires a substantial evidentiary showing. It is not sufficient simply to show that a shareholder exercised control over a corporation's activities, but it must be shown that the corporate structure was essentially a sham:

> Because the cardinal rule of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders, the mere operation of corporate business does not render one personally liable for corporate acts. Sole ownership of a corporation by one person or another corporation is not a factor, and neither is the fact that the sole owner uses and controls it to promote his ends. There must be evidence of abuse of the corporate form. Plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control.

J-Mart Jewelry Outlets, Inc. v. Standard Design, 218 Ga. App. 459, 460 (1995). Although courts should exercise "great caution" in disregarding the corporate entity, "it is axiomatic that 'when litigated, the issue of piercing the corporate veil is for the jury.'" Id. (quoting Williams Plaza v. Sedgefield Sportswear Div. of Blue Bell, Inc., 164 Ga. App. 720, 724 (1982)).

The evidence submitted by Guarantee in support of its alter ego claim is sufficient to create a genuine issue of material fact as to Selph's relationship to Merchants. A reasonable jury could determine based on the evidence presented that Selph used Merchants as a conduit for his personal affairs and failed to observe the forms of corporate identity. It is undisputed that Selph was the sole owner of Merchants, as well as several other corporations. There is evidence to indicate that there was considerable interaction among these corporations. Guarantee has submitted cash receipts

journals from JJ Selph Construction, Inc., another corporation owned by Selph. These journals include numerous entries for reimbursement of expenses paid by Merchants or other companies owned by Selph and entries for repayment of loans from such businesses.

Most significantly, there is evidence that Selph used funds obtained from premium payments by Merchants' clients to finance a new business started by his wife. Eric Halter, who was an agent of Guarantee at the time, has testified that Selph admitted in a February 2007 meeting that he had collected premiums from clients but had failed to remit them to Guarantee. See Pl.'s Resp. Ex. Z ¶ 2. According to Halter, Selph stated "that he had used portions of the premiums he collected on behalf of Guarantee Insurance Company to start a new Professional Employer Organization with his wife." Id. ¶ 3. Based on this evidence, a jury could conclude that Selph disregarded the corporate separateness of Merchants and used it as an instrumentality to transact his own affairs, in such a way as to defeat justice or evade contractual responsibilities.

**VII.  Count Seven – Responsible Corporate Officer**

In Count Seven, Guarantee seeks to impose personal liability on Selph under the theory that "[a]n officer of a corporation who personally takes part in a tort committed by the corporation may be held personally liable." Construction Lender, 228 Ga. App. at 407. The "responsible corporate officer" theory is applied only in tort cases. Guarantee has cited no cases in which a corporate officer has been held personally liable for a breach of contract. As set forth above, this case is a breach of contract case, and Guarantee has failed to present sufficient evidence to support any tort claim.

**VIII.  Count Eight - Accounting**

In Count Eight of the Complaint, Guarantee contends that it is "entitled to an accounting from [Merchants] explaining and accounting for all premium payments made on behalf of

[Merchants'] clients." Pl.'s Resp. 19. It has offered no legal authority to support such a claim. The Court can only guess that Guarantee is seeking an equitable accounting under O.C.G.A. § 23-2-70. Such an accounting "is granted only in carefully prescribed and determined circumstances." <u>Herring v. Standard Guaranty Ins. Co.</u>, 238 Ga. 261, 262 (1977). Because accounting is an equitable remedy, a party seeking an accounting must demonstrate that it has no adequate remedy at law. In this case, Guarantee has an adequate remedy at law in the form of its breach of contract action, with the availability of extensive discovery. <u>See</u> <u>Faircloth v. A. L. Williams & Assocs., Inc.</u>, 219 Ga. App. 560, 560 (1995). Accordingly, summary judgment is granted as to Count Eight.

It is SO ORDERED this 30th day of September, 2010.

<div style="margin-left:3em">
S/ C. Ashley Royal  
C. ASHLEY ROYAL, JUDGE  
UNITED STATES DISTRICT COURT
</div>

chw